1  DORON WEINBERG (SBN 46131)
   WEINBERG & WILDER
2  523 Octavia Street
   San Francisco, CA 94102
3  Telephone:  (415) 431-3472
   Facsimile:   (415) 552-2703
4  doronweinberg@aol.com

5  Attorneys for Defendant
   BERNARD V. WARD
6

7                 UNITED STATES DISTRICT COURT

8          FOR THE NORTHERN DISTRICT OF CALIFORNIA

9                        SAN FRANCISCO

10

11  UNITED STATES OF AMERICA,  )    **Case No. CR-07-0602 VRW**
                               )
12            Plaintiff,       )    **MEMORANDUM OF POINTS**
                               )    **AND AUTHORITIES IN SUPPORT OF**
13            vs.              )    **MOTION FOR RULING THAT THE**
                               )    **DEFENDANT IS ENTITLED TO PRESENT**
14  BERNARD V. WARD,           )    **THE AFFIRMATIVE DEFENSE THAT HE**
                               )    **RECEIVED AND DISTRIBUTED THE**
15            Defendant.       )    **CHARGED CONTRABAND FOR**
   _____ )    **LEGITIMATE, FIRST AMENDMENT-**
                                    **PROTECTED PURPOSES**
16
                                    **DATE:**      **April 24, 2008**
17                                  **TIME:**       **2:00 p.m.**
                                    **COURT:**      **6, 17th Floor**
18                                  **JUDGE:**      **Honorable Vaughn R. Walker**

19

20

21

22

23

24

25  Memorandum of Points and Authorities in Support of
    Motion for Ruling That the Defendant is Entitled to Present An
26  Affirmative Defense (Case No. CR-07-0602 VRW)

# TABLE OF CONTENTS

|  |  |  | PAGE |
|---|---|---|---|
| I. | THE STATUTE AND THE LEGISLATIVE HISTORY | | 2 |
| II. | *FERBER* AND ITS PROGENY SUPPORT THE AVAILABILITY OF A LEGITIMATE PURPOSE/FIRST AMENDMENT DEFENSE | | 7 |
| | A. | The Supreme Court Cases | 7 |
| | B. | The Cases Under § 2252 | 10 |
| III. | UNDER THE PREVAILING AUTHORITY, DEFENDANT MUST BE PERMITTED TO ASSERT A LEGITIMATE USE/FIRST AMENDMENT DEFENSE | | 15 |
| | A. | The Legislative History | 15 |
| | B. | The Overbreadth Issue | 16 |
| | C. | Logic and Policy | 19 |
| CONCLUSION | | | 21 |

Memorandum of Points and Authorities in
Support of Motion for Ruling That The
Defendant is Entitled to Present An
Affirmative Defense (No. CR-07-0602 VRW)

i

1    # TABLE OF AUTHORITIES

2    **CASES**                                                                                      **PAGE**

3    *Armijo v. Mukasey*, 2008 WL 59432, 2 n.2 (9th Cir. 2008)                                        2

4    *Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002)                                      2, 12

5    *Miller v. California*, 413 U.S. 15 (1973)                                                       7

6    *New York v. Ferber*, 458 U.S. 747 (1982)                                                   passim

7    *Osborne v. Ohio*, 495 U.S. 103 (1990)                                                       17, 18

8    *Stanley v. Georgia*, 394 U.S. 557 (1969)                                             3, 4, 5, 6, 17

9    *Stanley v. United States*, 932 F. Supp. 418 (E.D.N.Y. 1996)                               3, 12, 14

10   *United States v. Bunnell*, 2002 WL 927765 (D.Me.,2002)                                         12

11   *United States v. Romm*, 455 F.3d 990 (9th Cir. 2006)                                           15

12   *United States v. Hibbler*, 159 F.3d 233 (6th Cir.1998)                                         12

13   *United States v. Hilton*, 167 F.3d 61 (1st Cir.1999)                                           12

14   *United States v. Lamb*, 945 F. Supp. 441 (N.D.N.Y. 1996)                                   passim

15   *United States v. Matthews*, 209 F.3d 338 (4th Cir. 2000)                                   passim

16   *United States v. Ronald J. Bryant*, No. CR-92-35R (W.D. Wash. May 13, 1992)                    12

17   *United States v. Upham*, 168 F.3d 532 (1st Cir. 1999)                                       11, 12

18   *United States Navy v. Reeder* 1999 WL 985177 (N.M.Ct.Crim.App. 1999)                          12

19   **STATUTES AND OTHER AUTHORITIES**

20   18 U.S.C. § 2251                                                                         3, 7, 9, 11

21   18 U.S.C. §2252                                                                      2, 3, 7, 10, 13

22   1984 U.S.C.C.A.N. 492                                                                       4, 5, 11

23   21 U.S.C.§ 885(d)                                                                               20

24   Federal Rule Evidence  201(b)                                                                   21

25   Memorandum of Points and Authorities in
     Support of Motion for Ruling That The
26   Defendant is Entitled to Present An                           ii
     Affirmative Defense (No. CR-07-0602 VRW)

1    H.R. Rep. No. 98-536, 98th Cong., 2d Sess. (1983)        3, 4, 5, 6

2    H.R. Rep. No. 438, 95th Cong., 2d Sess. 5 (1977)        11

3    H.R. REP. 98-536, P.L. 98-292,        5, 6

4    United States Constitution

5      First Amendment        passim

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DORON WEINBERG  (SBN 46131)
WEINBERG & WILDER
523 Octavia Street
San Francisco, CA 94102
Telephone:  (415) 431-3472
Facsimile:   (415) 552-2703
doronweinberg@aol.com

Attorneys for Defendant
BERNARD V. WARD

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | **Case No. CR-07-0602 VRW** |
| ) | |
| Plaintiff, ) | **MEMORANDUM OF POINTS** |
| ) | **AND AUTHORITIES IN SUPPORT OF** |
| vs. ) | **MOTION FOR RULING THAT THE** |
| ) | **DEFENDANT IS ENTITLED TO PRESENT** |
| BERNARD V. WARD, ) | **THE AFFIRMATIVE DEFENSE THAT HE** |
| ) | **RECEIVED AND DISTRIBUTED THE** |
| Defendant. ) | **CHARGED CONTRABAND FOR** |
| _____ ) | **LEGITIMATE, FIRST AMENDMENT-** |
| | **PROTECTED PURPOSES** |

**DATE:**      **April 24, 2008**
**TIME:**      **2:00 p.m.**
**COURT:**    **6, 17th Floor**
**JUDGE:**     **Honorable Vaughn R. Walker**

Bernie Ward is a widely known and widely respected radio personality. He has researched

and written several books and published many articles. In the process of researching a new book,

Mr. Ward came into possession of the photographs that are the subject of the pending indictment.

Suffice to say, for the purpose of this motion, that if given the chance at trial Mr. Ward will offer

proof that he received and distributed the contraband exclusively for the purpose of furthering his

Memorandum of Points and Authorities in Support of
Motion for Ruling That the Defendant is Entitled to Present An
Affirmative Defense (Case No. CR-07-0602 VRW)                    1

1  research, and that he intended to destroy the material upon completion of his journalistic

2  enterprise. He will, if given the chance, assert the affirmative defense that his receipt and

3  distribution of the contraband photographs was legitimate, and in his case was an expert exercise

4  of his First Amendment-protected right to research and comment upon societal mores.

5      But the uncertain state of the law on his right to present such an affirmative defense to

6  charges under 18 U.S.C. §2252A, leads defendant to seek a pre-trial ruling on the issue. Neither

7  the Ninth Circuit nor any district court in the Circuit has addressed the issue in a published

8  decision. Circuits and districts around the country are divided. Neither the statute nor the

9  legislative history provides conclusive guidance. But as will appear, a close look at the relevant

10  authorities strongly suggests a defendant charged under §2252A must be able to assert the

11  legitimate use/First Amendment defense. In the absence of a right to assert a legitimate

12  purpose/First Amendment defense, the statute is plainly overbroad.

13  **I.    THE STATUTE AND THE LEGISLATIVE HISTORY**

14      Federal law outlaws the receipt and distribution of child pornography. 18 U.S.C.

15  §2252A(a)(2)(A). The statute does not expressly provide an affirmative defense for a person who

16  receives and/or distributes child pornography for some apparently legitimate purpose, including

17  use by a journalist for an otherwise First Amendment-protected purpose.

18      In considering whether the legislative history of a parallel statute,[1] supports a legitimate

19

20      [1] In 1996 the Congress passed 18 U.S.C. §2252A. In many respects the statute was
identical to the existing law, §2252. As the Ninth Circuit recently noted, "The requirement that
21  the depiction portray actual minors provides the distinction between 18 U.S.C. § 2252 and 18
U.S.C. § 2252A. The latter prohibits possession of 'child pornography,' including depictions of
22  both actual and 'virtual' minors." *Armijo v. Mukasey*, 2008 WL 59432, *2 n.2 (9th Cir. 2008). In
*Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 251 (2002), among other things, the Supreme
23  Court invalidated provisions of the new law that prohibited possession of materials that depict
24  "virtual" minors. In light of *Ashcroft*, and for the purposes of the counts charged here, the laws
are identical and the cases interpreting §2252 are applicable.

25

Memorandum of Points and Authorities in Support of
Motion for Ruling That the Defendant is Entitled to Present An
Affirmative Defense (Case No. CR-07-0602 VRW)                2
26

1  use/First Amendment affirmative defense, three courts have come to differing conclusions.

2      *Stanley v. United States*, 932 F.Supp. 418 (E.D.N.Y. 1996), was a forfeiture case. Police

3  found images of child pornography in Stanley's house. He claimed the material was connected to

4  an article he published in the *Cardoza Arts and Entertainment Law Journal* and he was acquitted

5  of all charges.[2] Stanley later sought return of the contraband. For the purpose of its decision the

6  district court assumed that a "literary, scientific, or educational exception" to the forfeiture statute

7  exists, but went on to conclude that Stanley failed to demonstrate such bona fides. *Id.* at 21-22. In

8  a brief aside, the court noted that "Legislative history of the Child Protective Act [18 U.S.C.

9  §2252] reveals that Congress rejected a proposed affirmative defense for serious literary, artistic,

10  scientific, social, or educational value to prosecution under the child pornography laws, 18

11  U.S.C. § 2251 et seq. H.R.Rep. No. 98-536, 98th Cong., 2d Sess., at 4 (1983)." 932 F.Supp. at

12  421.

13      Just a few months after *Stanley*, another district court in New York took on the issue of

14  the availability of a legitimate purpose/First Amendment defense and the relevant legislative

15  history in *United States v. Lamb*, 945 F.Supp. 441 (N.D.N.Y. 1996). Defendant was indicted for

16  receipt and possession of child pornography under 18 U.S.C. §2252. Lamb leveled a facial

17  challenge to the law. 945 F.S.Supp. 447. Among other things, Lamb argued that the statute is

18  overbroad because "it does not explicitly except materials with serious literary, artistic, scientific,

19  or educational value from its sweep." *Id.* at 449.  The district court rejected that argument,

20  holding that "the availability of an *unconstitutional-as-applied defense* substitutes for the lack of

21  these express affirmative defenses." *Id.* (Emphasis added) It acknowledged the legislative history

22  analysis in *Stanley*, but noted that

23  ─────────────────────

24      [2] The opinion does not state whether he was acquitted on the basis of a legitimate purpose
    defense.

25

26  Memorandum of Points and Authorities in Support of
    Motion for Ruling That the Defendant is Entitled to Present An
    Affirmative Defense (Case No. CR-07-0602 VRW)          3

the *Stanley* opinion neglected to consider the testimony of a Justice
Department official contained in the same report on the subject of
the affirmative defense: "Even in the absence of the affirmative
defense provided in H.R. 2432, *a defendant may take the position
that the application of the child pornography statute to his case is
unconstitutional and falls within the "tiny fraction of the materials
within the statute's reach" which the Court recognized should
receive constitutional protection. 458 U.S. at 772-74, 102 S.Ct. at
3363.[³] Thus, the affirmative defense provision (which was not in
the New York statute approved in Ferber ) is unnecessary.*
H.R.Rep. No. 536, 98th Cong., 2d Sess. 13 (1983), reprinted in
1984 U.S.C.C.A.N. 492, at 504 (testimony of Mark M. Richard,
Dep. Ass't Att'y Gen.)." Thus the fact that the affirmative defense
was rejected could have just as easily meant that Congress
acknowledged that some small amount of material literally covered
by the statute was nonetheless protected by the guarantee of free
speech, rendering the express defense redundant, or perhaps overly
generous compared to what stands behind the First Amendment's
aegis.

945 F.Supp. at 449 (emphasis added). *Lamb*, which is discussed in greater detail below,

ultimately accepted the notion that a defendant must be able to assert a legitimate purpose

defense under the First Amendment. *Id.* at 450

Finally, in *United States v. Matthews*, 209 F.3d 338 (4th Cir. 2000), a journalist was

charged with possessing child pornography. The district court disallowed a legitimate purpose

defense. Citing the same Justice Department testimony referenced in *Stanley* and *Lamb*, the

circuit noted that Congress had considered and rejected an affirmative defense "for certain

categories of child pornography which, 'when taken as a whole, possess[ ] serious literary,

artistic, scientific, social, or educational value.' H.R.Rep. No. 98-536, at 12 (1983), reprinted in

1984 U.S.C.C.A.N. 492, 503 (statement of Mark M. Richard, Deputy Ass't Att'y Gen.)." 209 F.3d

at 348. *Matthews* acknowledged that Justice believed a First Amendment defense was available

---

[³] This citation, contained in the report of the Justice Departments position on the
affirmative defense provision, is to *New York v. Ferber*, 458 U.S. 747 (1982), the leading child
pornography case, discussed in detail *infra*.

Memorandum of Points and Authorities in Support of
Motion for Ruling That the Defendant is Entitled to Present An
Affirmative Defense (Case No. CR-07-0602 VRW)                4

1   to a small number of defendants even in the absence of an express affirmative defense provision.

2   *Id.* But it favored the *Stanley* court's view, citing a further statement by the Justice Department

3   official:

> "Including an affirmative defense provision in the federal child
> pornography statute in our view would produce consequences far
> beyond protecting the small class of materials referred to by the
> Court. It may provide an appealing loophole for pornographers
> intent upon thwarting the purpose of the statute by placing
> otherwise proscribed child pornography materials within a
> legitimate literary or scientific work. Proving the defense-that the
> medium, when taken as a whole, possesses serious literary, artistic,
> scientific, social, or educational value-would not be difficult in
> such cases. The affirmative defense proposed in H.R. 2432 is
> practically an invitation to distribute child pornography in a
> conviction-proof medium."1984 U.S.C.C.A.N. at 504 . . . .

209 F.3d at 349-350.

All three courts missed an aspect of the legislative history that is critical to the question

they addressed: whether a defendant charged with possessing child pornography can assert a

legitimate purpose/First Amendment defense. As will appear, when viewed properly, this

legislative history either supports the right of a defendant to assert a legitimate purpose/First

Amendment defense or, at most, it is indeterminate.

Congress had pending several bills aimed at changing existing child pornography laws.

The amendments proposed, for example, to remove the requirement that images must be proven

to be obscene and that they are created for commercial purposes. *See H.R. REP. 98-536, P.L.*

*98-292, Child Protection Act of 1984,* House Report, No. 98-536 (November, 10, 1983). As

noted, also, one bill proposed to add an affirmative defense for "child pornography which, when

taken as a whole, possesses serious literary, artistic, scientific, social, or educational value." *Id.*

A Justice Department witness testified that the proposed affirmative defense was aimed at

"prosecutions brought for the *production or distribution of child pornography* depicting certain

Memorandum of Points and Authorities in Support of
Motion for Ruling That the Defendant is Entitled to Present An
Affirmative Defense (Case No. CR-07-0602 VRW)                5

1  categories of sexually explicit conduct." *Id.* (Emphasis added). As the witness reported, "the

2  defense with regard to these categories would be that 'the medium, when taken as a whole,

3  possesses serious literary, artistic, scientific, social, or educational value.'" *Id.* As *Stanley*, *Lamb*

4  and *Matthews* acknowledge, the Justice lawyer said (a) the defense is unnecessary because it is

5  already available under *Ferber, supra* and (b) the defense should be rejected because it would

6  provide an out to illegitimate pornographers.

7        But none of the opinions cite the Justice witness's explanation of the reason for the

8  proposed affirmative defense: "We believe that the primary purpose of the proposed affirmative

9  defense is to address concerns raised by authors and publishers of legitimate sex education books

10  who fear that, without such a defense, their works would be reached by the anti-child

11  pornography law." *H.R. REP. 98-536, P.L. 98-292, Child Protection Act of 1984,* House Report,

12  No. 98-536(November, 10, 1983) The witness went on to reassure such publishers and authors

13  that "the Department does not view the bills I have discussed as designed to reach legitimate sex

14  education material." *Id.*

15        What is apparent from the statements by the Justice witness, and especially his

16  understanding that the affirmative defense was sought by publishers and authors of sex education

17  material, is that the proposed defense (and the argument over whether such a defense was

18  appropriate) was directed primarily not at possession and receipt offenses under §2252 but rather

19  at "production and distribution" offenses under §2251. In other words, the question raised by the

20  affirmative defense was whether a photographer or a film-maker could shoot images of naked

21  children or children engaged in sexual activity and assert that *creation* of the material was lawful

22  because it possessed "serious literary, artistic, scientific, social, or educational value."

23        The witness's references to *Ferber* in his testimony further make clear what was at issue.

24  *Ferber* was not a possession/receipt/distribution case; rather, it was a case in which the court

25

26  Memorandum of Points and Authorities in Support of
Motion for Ruling That the Defendant is Entitled to Present An
Affirmative Defense (Case No. CR-07-0602 VRW)     6

considered the validity of a New York law which outlawed the "use" of a child in a sexual performance, whether live or filmed. 458 U.S. at 750. So, again, the witness's focus was on the *use* of children, outlawed under 18 U.S.C. §2251, to *create* sexually explicit materials, and, in his view, the drawbacks of providing a First Amendment defense to such conduct.

What neither the proposed affirmative defense nor the arguments against it ever considered was whether a journalist investigating a story on child pornography who receives and/or distributes otherwise contraband imagery might be entitled to a legitimate purpose/First Amendment defense. If the Justice witness did offer any insight into the question then, as the *Lamb* court noted, his statement that a First Amendment defense is already available under *Ferber* suggests that the *Matthews* court got it wrong: such a defense must be available or, as *Lamb* held, in some cases §2252 as applied would be fatally overbroad.

## II.    *FERBER* AND ITS PROGENY SUPPORT THE AVAILABILITY OF A LEGITIMATE PURPOSE/FIRST AMENDMENT DEFENSE

### A.    The Supreme Court Cases

As noted, in *New York v. Ferber*, 458 U.S. 747 (1982), the Supreme Court considered the validity of a New York law which forbade "use" of a child in a sexual performance. 458 U.S. at 751. Notably, the law did not require that the conduct be obscene within the meaning of *Miller v. California*, 413 U.S. 15 (1973). Justice White, writing for the court, with Justice Blackmun concurring, concluded that states are entitled to afford minors special protections by means of statutes that outlaw child pornography without regard for obscenity. *See id.* at 756 et seq. Among other things, the Court relied on its view that "The value of permitting live performances and photographic reproductions of children engaged in lewd sexual conduct is exceedingly modest, if not de minimis. *We consider it unlikely that visual depictions of children performing sexual acts or lewdly exhibiting their genitals would often constitute an important and necessary part of a*

Memorandum of Points and Authorities in Support of
Motion for Ruling That the Defendant is Entitled to Present An
Affirmative Defense (Case No. CR-07-0602 VRW)                7

1  *literary performance or scientific or educational work.*" *Id.* at 762-763 (emphasis added). Of

2  course, the *Ferber* court never held that receipt and/or distribution of child pornography might

3  not be necessary to entirely legitimate, First Amendment-protected journalistic activity.

4       The *Ferber* court finally addressed the question whether the statute was overbroad

5  because it might "forbid the distribution of material with serious literary, scientific, or

6  educational value or material . . . ." *Id.* at 766. The Court concluded that the instances of legal

7  conduct covered by the statute would be sufficiently small that the remedy would not be to

8  invalidate the statute, but rather to address those situations on a "case-by-case" basis:

9           How often, if ever, it may be necessary to employ children to
            engage in conduct clearly within the reach of § 263.15 in order to
10          produce educational, medical, or artistic works cannot be known
            with certainty. Yet we seriously doubt, and it has not been
11          suggested, that these arguably impermissible applications of the
            statute amount to more than a tiny fraction of the materials within
12          the statute's reach. Nor will we assume that the New York courts
            will widen the possibly invalid reach of the statute by giving an
13          expansive construction to the proscription on "lewd exhibition[s]
            of the genitals." Under these circumstances, § 263.15 is "not
14          substantially overbroad and . . . *whatever overbreadth may exist
            should be cured through case-by-case analysis of the fact
15          situations to which its sanctions, assertedly, may not be applied.*"

16  458 U.S. at 773-774 (emphasis added)

17       There are three concurring opinions in *Ferber,* all of which join in the judgment.

18       Justice O'Connor wrote to say that despite Justice White's reference to a possible

19  exception for legitimate works that depict children, "the compelling interests identified in today's

20  opinion . . . suggest that the Constitution might in fact permit New York to ban knowing

21  distribution of works depicting minors engaged in explicit sexual conduct, regardless of the

22  social value of the depictions." 458 U.S. at 774 (O'Connor, J., concurring).

23       Justice Brennan, with whom Justice Marshall joined, took the contrary view:

24  "[A]pplication of [the New York law] or any similar statute to depictions of children that in

25

26  Memorandum of Points and Authorities in Support of
Motion for Ruling That the Defendant is Entitled to Present An
Affirmative Defense (Case No. CR-07-0602 VRW)        8

1  themselves do have serious literary, artistic, scientific, or medical value, would violate the First

2  Amendment." *Id.* at 776 (Brennan, J., concurring in the judgment)

3      All three opinions discussed above, and their varying views about First Amendment

4  protection, are focused at the *production*—in other words, the creation and distribution by the

5  creators—of offending material, the target of the New York law and the sort of conduct that is

6  covered under federal law by 18 U.S.C. §2251. Only Justice Stevens, in his concurring opinion,

7  took the next step to consider how the First Amendment might apply to one who observes or

8  possesses the material.

9      Justice Stevens first wrote that "the state statute that respondent violated prohibits some

10  conduct that is protected by the First Amendment." *Id. at* 777 (Stevens, J., concurring in the

11  judgment). Stevens concluded that Ferber's conviction does not violate the constitution because

12  "there is no claim that the films included any material that had literary, artistic, scientific, or

13  educational value." *Id.* The language that follows is critical to the issue raised by this case

14  because, unlike the majority or other concurring opinions, its reaches beyond the production

15  issue:

16          A holding that respondent may be punished for selling these two
             films does not require us to conclude that other users of these very
17          films, or that other motion pictures containing similar scenes, are
             beyond the pale of constitutional protection. Thus, the exhibition of
18          these films before a legislative committee studying a proposed
             amendment to a state law, or before a group of research scientists
19          studying human behavior, could not, in my opinion, be made a
             crime. Moreover, it is at least conceivable that a serious work of
20          art, a documentary on behavioral problems, or a medical or
             psychiatric teaching device, might include a scene from one of
21          these films and, when viewed as a whole in a proper setting, be
             entitled to constitutional protection. *The question whether a*
22          *specific act of communication is protected by the First Amendment*
             *always requires some consideration of both its content and its*
23          *context.*

24  *Id.* at 778 (emphasis added).

25
    Memorandum of Points and Authorities in Support of
26  Motion for Ruling That the Defendant is Entitled to Present An
    Affirmative Defense (Case No. CR-07-0602 VRW)          9

1    **B.    The Cases Under §2252**

2    Other than Justice Stevens' statement in *Ferber*, the Supreme Court has never addressed

3    the issue raised here: even assuming the *production* of contraband (barred under §2251) is

4    afforded no First Amendment protection, can a person charged with receipt or distribution—who

5    is not charged with production—of child pornography assert a legitimate use/First Amendment

6    defense. As noted, several lower courts have faced the issue, although few have done so squarely,

7    but, as noted, none has acknowledged that because of the context in which *Ferber* arose, that

8    case provides little guidance on the question of First Amendment protections for *use* as opposed

9    to *production*.

10    *Lamb* and *Matthews* offer the most detailed examination of the issue.

11    In *Lamb* the question arose as the result of a pre-trial motion in which the defendant

12    sought dismissal of the indictment on overbreadth grounds. Lamb first argued that the statute was

13    overbroad because it "fails to make explicit exceptions for possession of child pornography by

14    law enforcement officers, prosecutors, the court, or a jury." 945 F.Supp. at 448. The court

15    rejected the argument: "Obviously, neither the court nor a juror is subject to prosecution for

16    possession of contraband if it is being examined as evidence at trial, and it is a sophistry to

17    suggest that because possession of contraband is illegal, a law enforcement officer may not seize

18    it or an assistant U.S. attorney may not present it as evidence in a prosecution." *Id.* The court

19    offered no statute or other authority to support this view.

20    Next Lamb argued that the statute is overbroad because "it does not explicitly except

21    materials with serious literary, artistic, scientific, or educational value from its sweep." *Id.* at 449.

22    The court rejected the argument, holding that "the availability of an unconstitutional-as-applied

23    defense substitutes for the lack of these express affirmative defenses." *Id.* As discussed

24    previously, the court relied on statements by the Justice Department that suggested a First

25

26    Memorandum of Points and Authorities in Support of
Motion for Ruling That the Defendant is Entitled to Present An
Affirmative Defense (Case No. CR-07-0602 VRW)                10

Amendment defense was available under *Ferber*. *Id.* In an observation that effectively sums up defendant's position here, the court said this:

> The legislative history accompanying the Protection of Children Act reveals that the Senate relied on the research of Robin Lloyd, who authored a book on boy prostitution. She "documented the existence of over 260 different magazines which depict children engaging in sexually explicit conduct." S.Rep. 438, 95th Cong., 2d Sess. 5 (1977), reprinted in 1978 U.S.C.C.A.N. 40, 43. *It is difficult to imagine how a researcher today could catalog so many publications of this sort without running afoul of the child pornography law. The answer is that such activity may be protected by the Constitution.*

945 F.Supp. at 450 n.4.[4] The court finally concluded that the defendant must be able to present evidence and argument to support his legitimate purpose/First Amendment defense that "his possession of child pornography was pursuant to research he was undertaking in his capacity as a psychiatrist at the Auburn Correctional Facility." *Id.* at 450.

In varying contexts, other courts have demonstrated their agreement with the *Lamb* court's analysis that a defendant charged with receipt or distribution of child pornography is entitled to assert a legitimate use/First Amendment defense.

For example, in *United States v. Upham*, 168 F.3d 532 (1st Cir. 1999), a defendant convicted of possessing child pornography asked the trial court to award him an acceptance of responsibility reduction to his Guidelines score, despite the fact that he went to trial. He argued that he went to trial "only to present his 'First Amendment' defense." *Id.* at 537. As the court noted, "the main thrust of Upham's defense at trial was his claim that he had possessed child pornography in order to write a book about it." *Id.* The trial court accepted that the defense was

---

[4] The court also made this observation: "This court presumes that Special Agent Ken Lanning, who according to the affidavits in the search warrants in this case is an expert in the field of child pornography and pedophilia, could not be subject to prosecution consonant with the First Amendment for violations of this statute, even if he literally transgressed its boundaries in the writing of his book, *Child Pornography and Sex Rings*." 945 F.Supp. at 950.

Memorandum of Points and Authorities in Support of
Motion for Ruling That the Defendant is Entitled to Present An
Affirmative Defense (Case No. CR-07-0602 VRW)                11

permissible, but found proof of the defense lacking. *Id.* The First Circuit affirmed, accepting that the legitimate purpose defense was permissible, but finding evidence to support it lacking. *Id.* ("Over many years of purported book writing, Upham had written only a few pages of this supposed work."); *see also United States v. Hibbler*, 159 F.3d 233, 236 (6th Cir.1998)(school principal asserted defense that his possession of child pornography was part of investigation into risk of access to such material by students at his school; defendant appears to have asserted the defense at trial and in light of the convictions, the lower court granted downward departure on this basis); *United States v. Hilton*, 167 F.3d 61, 74 (1st Cir.1999)(acknowledging a belief that a First Amendment affirmative defense would be available vis-à-vis certain child pornography prosecutions but declining to define its "precise dimensions"), overruled on other grounds by *Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002).

Defendant has located three unpublished decisions which support the *Lamb* view. Given the paucity of authority on the issue, those cases are cited here for the Court's edification. *United States v. Bunnell*, 2002 WL 927765 (D.Me.,2002)(defendant entitled to assert defense at trial that his possession of child pornography was for "literary purpose" associated with his university research into childhood sexual abuse); *United States Navy v. Reeder* 1999 WL 985177 (N.M.Ct.Crim.App. 1999)(acknowledging that receiving and possessing child pornography is not a strict liability offense and that defenses may exist, including the "as applied" First Amendment defense under *Lamb*); *United States v. Ronald J. Bryant*, No. CR92-35R (W.D.Wash. May 13, 1992)(Chief Judge Rothstein, found that "child pornography legitimately transported or possessed for academic purposes is one of the narrow categories of material that the Supreme Court in *Ferber* anticipated would have First Amendment protection."), cited in *Stanley v. United States*, 932 F.Supp. 418, 420 n.3.

The *Matthews* opinion supplies the most detailed analysis going the other way. Matthews

Memorandum of Points and Authorities in Support of
Motion for Ruling That the Defendant is Entitled to Present An
Affirmative Defense (Case No. CR-07-0602 VRW)                12

1    had been a journalist for more than twenty-five years. While working in radio he produced a

2    three-part series about Internet child pornography. During this period he contacted the FBI to

3    report his findings and to provide information about a woman who had offered to sell Matthews

4    her two children. Thereafter he left the radio station and worked as a freelance journalist,

5    continuing to pursue the child pornography story. As part of that research he traded a large

6    number of photographs over the Internet. 209 F.3d at 339-340.

7        The government eventually indicted Matthews for sending and receiving child

8    pornography under 18 U.S.C. §2252(a)(1) and (a)(2). The district court refused to permit

9    Matthews to assert a legitimate purpose/First Amendment defense (*United States v. Matthews*, 11

10   F.Supp.2d 656 (D.Md.1998)), so he pleaded guilty, preserving the issue for appeal. 209 F.3d at

11   341.

12       The Fourth Circuit expressly rejected Matthews argument that under *Ferber*, a defendant

13   could assert a legitimate purpose/First Amendment defense to charges of possessing child

14   pornography. First, the court held that

15                    Matthews' asserted First Amendment defense . . . misses the
                     fundamental distinction between child pornography and adult
16                    pornography that the *Ferber* Court sought to draw. The
                     government has an interest in prohibiting the dissemination of
17                    both. But the government's interest in prohibiting the distribution
                     of adult pornography-to protect "the sensibilities of unwilling
18                    recipients, . . . pales in comparison to its interest in prohibiting the
                     dissemination of child pornography-to prevent sexual exploitation
19                    and abuse of children. . . . When adult pornography, taken as a
                     whole, has some "serious literary, artistic, political, or scientific
20                    value," . . . that value ameliorates its affront to the sensibilities of
                     unwilling recipients. *In contrast, any literary, artistic, political,*
21                    *scientific (or journalistic) value of child pornography does nothing*
                     *to ameliorate its harm to children. Ferber holds that while the*
22                    *government can ban only obscene adult pornography (that which,*
                     *taken as a whole, lacks serious literary, artistic, political, or*
23                    *scientific value"), the government can ban child pornography even*
                     *if not obscene. . . . In other words, although the obscenity test for*
24                    *adult pornography contains the type of First Amendment defense*

25   Memorandum of Points and Authorities in Support of
     Motion for Ruling That the Defendant is Entitled to Present An
26   Affirmative Defense (Case No. CR-07-0602 VRW)              13

1

> *that Matthews urges us to recognize, the Ferber Court*
> *unequivocally rejected such a defense in the context of child*
> *pornography offenses.*

2

3    209 F.3d at 345 (internal citations and quotation marks omitted)(emphasis added).

4        Further relying on *Ferber*, *Matthews* noted that the Supreme Court made clear that

5

> any impermissible applications of a statute banning the distribution
> of child pornography would be exceedingly few in number. The

6

> Court not only consider[ed] it unlikely that visual depictions of
> children performing sexual acts ... would often constitute an

7

> important and necessary part of a literary performance or scientific
> or educational work, . . . but also seriously doubt[ed] that such

8

> "applications of the statute [could] amount to more than a tiny
> fraction of the materials within the statute's reach.

9

*Id.* (internal citations and quotation marks omitted).

10

11        Finally, as discussed above, the *Matthews* court relied on the relevant legislative history,

12    holding that Congress's decision not to include the affirmative defense to the statute supported

13    the view that such a defense does not exist. *Id.* at 348-350.

14        The court summed up this way:

15

> To recapitulate, we believe that *Ferber* cannot fairly be read to
> permit a defense of the sort urged by Matthews. The asserted

16

> defense, apparently derived from the obscenity cases, fails to
> account for the discrete set of harms to which child pornography

17

> legislation is addressed. Such a defense would result in far more
> possibly impermissible applications of the statute than *Ferber*

18

> envisaged, fail to view the depictions in isolation as *Ferber*
> directed, and allow the dissemination of depictions that threaten
> the very harms to children described in *Ferber*.

19

*Id.* at 348.

20

21        *Matthews* thus stands for the proposition that *Ferber* precludes assertion of a legitimate

22    purpose/First Amendment defense to possession of child pornography under all circumstances.

23    Defendant has located only one other decision that takes a similar view. As noted, that ruling

24    occurred in the forfeiture context. *See Stanley v. United States*, 932 F.Supp. 418 (E.D.N.Y.

25

Memorandum of Points and Authorities in Support of
Motion for Ruling That the Defendant is Entitled to Present An
Affirmative Defense (Case No. CR-07-0602 VRW)                14

26

1    1996).

2    **III.    UNDER THE PREVAILING AUTHORITY, DEFENDANT MUST BE**
3    **PERMITTED TO ASSERT A LEGITIMATE USE/FIRST AMENDMENT**
     **DEFENSE**

4          It is worth risking repetition to say that defendant does not seek a ruling that this Court

5    must instruct the jury on Ward's legitimate purpose/First Amendment defense. Only if the

6    defense theory has a basis in fact is the failure to give a proffered jury instruction on that theory

7    reversible error. *See U.S. v. Romm,* 455 F.3d 990, 1002 (9th Cir. 2006). Rather, prior to trial,

8    defendant seeks this Court's opinion that such an affirmative defense is available to him as a

9    matter of law, that he be permitted to offer evidence on the defense at trial, and that if he supplies

10   a sufficient factual basis, the jury will be given the appropriate charge. In that context, free of the

11   factual tethers of the present dispute, it is obvious that the *Matthews* court's view must be wrong.

12         **A.    The Legislative History**

13         First, as noted, if the legislative history means anything it must mean that when Congress

14   rejected the proposed affirmative defense, it did so with one or both of the following in mind:

15   First, as the Justice witness stated, *Ferber* contemplates a defendant's right to assert a First

16   Amendment defense. And second, the proposed affirmative defense was intended simply to

17   protect publishers that may use children to produce legitimate sex education material. The Justice

18   witness told Congress that his Department would not pursue such prosecutions and argued that

19   the proposed defense could provide illegitimate producers a way around prosecution.

20         Thus, Congress's decision not to adopt the defense simply cannot, as the *Matthews* court

21   suggests, logically support the view that no legitimate purpose/First Amendment defense is

22   available to a journalist who receives and/or distributes child pornography as part of a legitimate

23   research project.

24         *Matthews* reliance on the testimony of a Postal Service witness shows the frailty of its

25

26   Memorandum of Points and Authorities in Support of
     Motion for Ruling That the Defendant is Entitled to Present An
     Affirmative Defense (Case No. CR-07-0602 VRW)              15

1 | position. Responding to the proposed affirmative defense, that witness told Congress:

2 | Only rarely does the child pornographer measure up to the
3 | stereotype image of the "dirty old man." Many of those displaying
an interest held respected positions within their communities and
have been able to conceal their interest in child pornography for
4 | years. There have been the professional dealers identified in our
investigations, but there have also been clergymen, teachers,
5 | psychologists, *journalists*, and businessmen.

6 | 209 F.3d at 350, quoting Statement of Charles R. Clauson, Ass't Chief Postal Inspector for

7 | Admin. (emphasis in original). *Matthew*'s use of italics to emphasize the reference to journalists

8 | is misconceived. The witness never said a working journalist might not have an entirely

9 | legitimate and First Amendment purpose to receive or distribute child pornography, for example,

10 | to a co-reporter. Rather, the witness made the unremarkable assertion that a journalist, like any

11 | other person, might be guilty of violating the law. But *Matthews* relied on this reference to

12 | journalists in the Postal Service witness's statement to hold that under no circumstance could any

13 | journalist be entitled to assert a First Amendment defense to child pornography charges.

14 | If the legislative history means anything, therefore, it means Congress declined to adopt

15 | the affirmative defense because it believed that such a defense already existed. In that case,

16 | defendant here must be entitled to assert the defense at trial.

17 | **B.    The Overbreadth Issue**

18 | At the heart of both *Ferber* and *Lamb* was the allegation that the statutes were overbroad

19 | because they cover both criminal conduct and First Amendment-protected activity. And in both

20 | cases the courts rejected the argument, holding that while such overbreadth arguments might well

21 | be available to another defendant in another case, the laws at issue were sufficiently narrowly

22 | tailored that they could not be considered facially overbroad. *See Ferber*, 458 U.S. at 773-774

23 | ("Under these circumstances, § 263.15 is 'not substantially overbroad and . . . whatever

24 | overbreadth may exist should be cured through case-by-case analysis of the fact situations to

25 |
26 | Memorandum of Points and Authorities in Support of
Motion for Ruling That the Defendant is Entitled to Present An
Affirmative Defense (Case No. CR-07-0602 VRW)          16

1   which its sanctions, assertedly, may not be applied."); *Lamb,* 945 F.Supp. at 449 (rejecting

2   overbreadth argument, court holds that "the availability of an unconstitutional-as-applied defense

3   substitutes for the lack of these express affirmative defenses.") Justice Stevens drove the point

4   home in his *Ferber* concurrence: "The question whether a specific act of communication is

5   protected by the First Amendment always requires some consideration of both its content and its

6   context." (458 U.S. at 778, (Stevens, J., concurring in the judgment). The defendant in *Matthews*

7   appears to have made the overbreadth argument (*see* 209 F.3d at 344), but the Fourth Circuit

8   never addressed it.

9       The question remains, therefore: if *Matthews* is correct and the present law countenances

10  no legitimate purpose/First Amendment defense under any circumstances, how can it survive an

11  overbreadth attack? As the Supreme Court's decision in *Osborne v. Ohio,* 495 U.S. 103 (1990),

12  makes clear, it cannot.

13      In *Osborne*, the defendant was convicted of possessing child pornography under an Ohio

14  statute. The law provided an exemption for possession (and other offenses) "for a bona fide

15  artistic, medical, scientific, educational, religious, governmental, judicial, or other proper

16  purpose, by or to a physician, psychologist, sociologist, scientist, teacher, person pursuing bona

17  fide studies or research, librarian, clergyman, prosecutor, judge, or other person having a proper

18  interest in the material or performance." *Id.* at 106.

19      The main issue in *Osborne* was whether a state may outlaw the pure possession of child

20  pornography, having held in *Stanley v. Georgia,* 394 U.S. 557 (1969), that a Georgia law

21  outlawing the private possession of obscene material was invalid. 495 U.S. at 108. The court

22  found that even assuming Osborne had a right to possess child pornography, Ohio had a far

23  greater interest in outlawing viewing and possession in an effort to destroy the market for such

24  materials. *Id.* at 109 et seq.

25

Memorandum of Points and Authorities in Support of
26  Motion for Ruling That the Defendant is Entitled to Present An
Affirmative Defense (Case No. CR-07-0602 VRW)            17

1    Osborne also argued that the statute was overbroad. The court responded just as it did in

2    *Ferber*:

> [W]e have repeatedly emphasized that where a statute regulates
> expressive conduct, the scope of the statute does not render it
> unconstitutional unless its overbreadth is not only real, but
> substantial as well, judged in relation to the statute's plainly
> legitimate sweep. Even where a statute at its margins infringes on
> protected expression, facial invalidation is inappropriate if the
> remainder of the statute . . . covers a whole range of easily
> identifiable and constitutionally proscribable . . . conduct.

*Id.* at 112 (internal citations and quotation marks omitted). Then, critically, the court cited the

legitimate purpose exceptions contained in the Ohio law and rejected the overbreadth argument,

holding that by "limiting the statute's operation in  this manner, the Ohio Supreme Court avoided

penalizing persons for viewing or possessing innocuous photographs of naked children." *Id.* at

113.[5]

It is fair to say that the United States Supreme Court has never addressed precisely the

issue raised here and in *Matthews*. But it hard to read *Ferber* and *Osborne* and come away with

the view that a statute could ban the possession of child pornography, and expressly exclude the

possibility of any legitimate purpose/First Amendment exception or defense, yet survive an

overbreadth attack. The New York statute at issue in *Ferber* contained no language about

legitimate use one way or another, and the Court (and especially Justice Stevens in his

concurrence) held that an as-applied overbreadth attack was available. The Ohio law at issue in

*Osborne* contained the exemption and the Court relied on it to hold that the statute was not

---

[5] The court also relied on the Ohio Supreme Court's interpretation of the law, which,
along with the exceptions contained in the law, limited its application to "the possession or
viewing of material or performance of a minor who is in a state of nudity, where such nudity
constitutes a lewd exhibition or involves a graphic focus on the genitals, and where the person
depicted is neither the child nor the ward of the person charged." 495 U.S. at 113 (internal
quotation marks and citation omitted).

Memorandum of Points and Authorities in Support of
Motion for Ruling That the Defendant is Entitled to Present An
Affirmative Defense (Case No. CR-07-0602 VRW)                    18

1    overbroad.

2    Thus, along with the legislative history, the case authority—with the notable exception of

3    *Matthews*, an opinion that never addressed the overbreadth issue—supports the view that a

4    legitimate purpose/First Amendment defense must be available to a defendant charged under

5    §2252A. *See, supra,* discussing *Lamb, Reeder* and *Bryant.*

6    **C.    Logic and Policy**

7    Finally, to see just how illogical the *Matthews* ruling is one need only consider a series of

8    articles published in 2006 in the New York Times by the Polk-Award winning investigative

9    journalist Kurt Eichenwald. *See, e.g.,* www.nytimes.com/2006/08/20/ business/ 20model.html

10   ?scp=185&sq=child+pornography&st=nyt. Eichenwald, who had done research on childhood

11   sexual abuse and teenage prostitution, among many other subjects, reported several articles

12   relating to child-modeling web sites, some of which portrayed images that could have subjected

13   anyone who received, possessed, or distributed them to prosecution under §2252A. As a result of

14   his reporting, which extended over several months, the FBI became aware of and shut down

15   various illegal enterprises. *Id.*

16   If *Matthews* is correct, Mr. Eichenwald is a felon. Indeed, while he notes in one article

17   that he turned over his findings to federal authorities, under §2252A, if over the period he

18   reported the articles he saw more than two illegal images, then the fact that he informed the

19   government makes no difference. Such a result not only conflicts with the legislative history and

20   case law, it is irrational. Eichenwald's work exposes evildoers and protects children; the law,

21   which *Matthews* makes clear was passed to protect that population, cannot possibly be read to

22   outlaw such important work. If *Matthews* is right, no journalist would pursue such an

23   investigation in the future because of the risks of criminal liability, a result that is contrary to all

24   of the state interests described by the Supreme Court in *Ferber* and *Osborne.*

25

26   Memorandum of Points and Authorities in Support of
Motion for Ruling That the Defendant is Entitled to Present An
Affirmative Defense (Case No. CR-07-0602 VRW)    19

1    Moreover, if *Matthews* is right, then logically no one can permissibly possess or receive

2  or distribute an image of child pornography under any circumstance. So, the FBI agent who

3  downloads an image from the Internet, and the prosecutor who reviews the photo for the purpose

4  of bringing charges, and the grand jurors who consider the image before returning an indictment,

5  and the lawyers who review it in preparing a defense, and the judge who sees it in presiding over

6  trial, and the jurors who review it in their deliberations, are all felons.

7    As noted, the *Lamb* court derided the argument that the absence of exemptions for law

8  enforcers and jurors rendered §2252 overbroad. 945 F.Supp. at 448. In that part of the opinion

9  the court asserted that such legitimate use was not within the reach of the statute, but it did not

10  explain why that was so or provide any supportive citation.[6] Of course, later the court made clear

11  that implicit in the law is the right to receive, possess, and distribute child pornography for

12  legitimate purposes—whether they be First Amendment or law enforcement purposes. *See id.* at

13  945 F.Supp. at 950 (citing the cases of the Special Agent who wrote about child pornography

14  rings and the researcher who wrote about child prostitution and whose research prompted

15  passage of the federal child pornography law). So, the reason the federal statute need not (as the

16  Ohio law does) expressly provide for exemptions for law enforcers and journalists is because the

17  statute assumes the existence of a legitimate purpose/First Amendment defense.

18                                          ///

19                                          ///

20                                          ///

21                                          ///

22

23    [6] It is worth noting that in other areas of criminal law, Congress has expressly provided
for law enforcement immunities. *See, e.g.,* 21 U.S.C.§ 885(d) (immunizing law enforcers from

24  civil or criminal liability for conduct that might otherwise subject them to prosecution for
narcotics offenses).

25

Memorandum of Points and Authorities in Support of

26  Motion for Ruling That the Defendant is Entitled to Present An
Affirmative Defense (Case No. CR-07-0602 VRW)          20

**CONCLUSION**

Describing the defendant's argument, the *Matthews* court said this:

> Matthews and his amici[7] present powerful rhetoric urging that he (and anyone else asserting such a defense) be allowed to present this defense to a jury. Let the jury decide, they argue: if the jury concludes that Matthews traded in pornography solely for a proper purpose, then the First Amendment prevents conviction; if the jury concludes that he acted for another purpose, then conviction is appropriate. The argument has visceral appeal. One of our bedrock principles is that every man deserves his day in court and the opportunity to have a jury consider his best defense.

209 F.3d at 344.

Defendant can hardly encapsulate his argument more artfully: in view of the foregoing, he should be permitted to introduce evidence that he had a legitimate, journalistic purpose in receiving and distributing child pornography. Assuming it is supported by that evidence, he is entitled to a jury instruction that a legitimate journalistic purpose comprises a complete defense to charges under §2252A. And he should be entitled to argue in support of such an affirmative defense.

Respectfully submitted,

WEINBERG & WILDER

Dated: April 9, 2008

By: /s/ Doron Weinberg
_____
DORON WEINBERG
Attorney for Defendant
BERNARD V. WARD

---

[7] Defendant asks the Court to take judicial notice of the compelling brief filed by amicus Reporter's Committee for Freedom of the Press in the *Matthews* case. (Exhibit A to this Memorandum) A judicially noticed fact is "one not subject to reasonable dispute in that it is either (1) generally known . . . or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b). Exhibit A was downloaded through a link below the Westlaw version of the officially-reported *Matthews* opinion. Defendant hereby incorporates by reference into this memorandum the arguments of amicus contained in Exhibit A.

Memorandum of Points and Authorities in Support of
Motion for Ruling That the Defendant is Entitled to Present An
Affirmative Defense (Case No. CR-07-0602 VRW)          21

# Exhibit A

Westlaw.
1999 WL 33612797 (C.A.4)                                                          Page 1
(Cite as: 1999 WL 33612797)

For Opinion See 209 F.3d 338

United States Court of Appeals, Fourth Circuit
UNITED STATES OF AMERICA, Appellee,
v.
Lawrence C. MATTHEWS, Appellant.
No. 99-4183.
August 2, 1999.

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND, THE HON.
ALEXANDER WILLIAMS, JR., UNITED STATES DISTRICT JUDGE

Brief of Amici Curiae in Support of Appellant Seeking Reversal

Respectfully submitted, The Reporters Committee For Freedom of the Press, Jane E.
Kirtley, Executive Director, Gregg P. Leslie, Jacqueline N. Ballinger, 1815 N. Fort
Myer Drive, Suite 900, Arlington, Virginia 22209, (703) 807-2100

**\*i TABLE OF CONTENTS**

TABLE OF AUTHORITIES ... ii

INTERESTS OF AMICI CURIAE AND CORPORATE DISCLOSURES ... iv

STATEMENT OF FACTS ... 1

SUMMARY OF ARGUMENT ... 1

ARGUMENT ... 3

 SECTION 2252, AS APPLIED TO A JOURNALIST ENGAGED IN NEWSGATHERING, IS ARGUABLY
OVERBROAD AND THEREFORE UNCONSTITUTIONAL, AND THE JOURNALIST MUST BE ALLOWED TO
RAISE THAT DEFENSE AT TRIAL.

 I. Newsgathering is Constitutionally Protected. ... 3

 II. First Amendment Defenses to a Prosecution Under the Law Therefore Must be
Allowed at Trial. ... 4

 III. Technical Violations of Criminal Statutes do not Negate the Need to Balance
First Amendment Interests. ... 5

CONCLUSION ... 11

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*ii *TABLE OF AUTHORITIES***

*Cases*

*Branzburg v. Hayes*, 408 U.S. 665 (1972) ... 3, 5

*Desnick v. American Broadcasting Cos., Inc.*, 44 F.3d 1345 (7th Cir. 1995) ... 6

*Grosjean v. American Press Co.*, 297 U.S. 233 (1936) ... 11, 12

*Idaho v. Hail,* No. 16075 (Dist. Ct. complaint dismissed Oct. 12, 1983 Shoshone
County) ... 8

*Lee v. The Columbian*, 16 Med. L. Rptr. 1261 (Wash. Super. Ct. Clark County 1988)
... 6

*Marcus v. Search Warrant*, 367 U.S. 717 (1961) ... 4

*NAACP v. Button*, 371 U.S. 415 (1963) ... 4, 5

*New York v. Santana*, No. 9-Q-064698 (N.Y. Sup. Ct. complaint dismissed Feb. 1,
1989) ... 10, 11

*New York v. Wallace*, No. 9-Q-064699 (N.Y. Sup. Ct. complaint dismissed Feb. 1,
1989) ... 10, 11

*Stahl v. Oklahoma*, 665 P.2d 839 (Okla. Crim. App. 1983), *cert. denied,* 104 S.Ct.
973 (1984) ... 6, 7

*State v. Garner*, No. 77 CR 15107 (N.C. Gen. Ct. Crim. Div. Davidson County Nov. 30,
1977) ... 9

*State v. Smithwick*, No. 77 CR 15106 (N.C. Gen. Ct. Crim. Div. Davidson County Nov.
30, 1977) ... 9

*United States v. Chaillou*, No. 89-11M-2 (E.D.N.Y. complaint filed Jan. 5, 1989) ...
10

\*iii *United States v. Frankel*, No. 89-11M-1 (E.D.N.Y. complaint filed Jan. 5, 1989)
... 10

*Zemel v. Rusk*, 381 U.S. 1 (1965) ... 3

*Constitutional Provisions*

U.S. Const. amend. I ... *passim*

*Statutes*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

18 U.S.C. § 2252 ... *passim*

18 U.S.C. § 371 (1987) ... 10

28 C.F.R. § 50.10 (1998) ... 3

*Periodicals*

*Newsmen Arrested for Fireworks Sales Probe,* The News Media and the Law (The Reporters Committee for Freedom of the Press, Washington, D.C.) April 1978 at 44 ... 8, 9

*Ballot Box Scheme Nets Charges Against Reporters and Editors*, The News Media and the Law (The Reporters Committee for Freedom of the Press, Washington, D.C.) Jan.-Feb. 1984 at 48 ... 8

*Air Security 'Tests' Net Arrests,* The News Media and the Law (The Reporters Committee for Freedom of the Press, Washington, D.C.) Winter 1989 at 45 ... 9, 10

### *IV INTERESTS OF *AMICI CURIAE* AND CORPORATE DISCLOSURE

*Amici Curiae* are organizations that share a deep and abiding commitment to preserving the First Amendment freedoms of the news media. *Amici* have received the consent of all parties to file this brief.

None of the *amici* have interests or affiliations requiring disclosure under FRAP 26.1 or Local Rule 26.1.

*Amici* are as follows:

*The Reporters Committee for Freedom of the Press* is a voluntary, unincorporated association of news editors and reporters dedicated to defending the First Amendment and freedom of information interests of the print and broadcast media.

The *Radio-Television News Directors Association* is a professional organization comprised of local and network news executives, educators, students and others in the radio, television and cable news business and is devoted to electronic journalism.

*National Public Radio, Inc.* is the leading radio newsgathering organization in the United States. It produces and distributes news and informational programming, including *Morning Edition, All Things Considered,* and *Talk of the *v Nation. NPR news programs are broadcast to millions of listeners every day through over 590 member and affiliated public radio stations throughout the United States. NPR as a non-profit membership corporation is also charged with representing the interests of its member stations, which are news organizations for their local communities, on matters affecting newsgathering and other issues of law and public policy. NPR strongly supports the rights of journalists such as Matthews to gather information to the fullest extent afforded by the First Amendment. NPR, Inc. is a private, non-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

profit 501(c)(3) corporation organized and incorporated in the District of Columbia. It has no shareholders.

The *Society of Professional Journalists* is a voluntary non-profit journalism organization representing every branch and rank of print and broadcast journalism. SPJ is the largest membership organization for journalists in the world, and for more than 90 years, SPJ has been dedicated to encouraging a climate in which journalism can be practiced freely, fully, and in the public interest.

### *1 STATEMENT OF FACTS

*Amici* adopt the statement of facts set forth in the Brief of Appellant.

### SUMMARY OF ARGUMENT

Confronted with a trial during which he would be barred from presenting a defense under the First Amendment, journalist Larry Matthews pleaded guilty to charges of trafficking in child pornography on the Internet under 18 U.S.C. § 2252(a). But that anti-pornography statute is no different from any other law; when its application conflicts with constitutional rights, the court must give careful consideration to those rights and weigh them against the need to enforce the statute in a given situation. In many cases, the law will be unconstitutionally overbroad as applied. *Amici* ask this court to vacate Matthews' conviction and sentence and allow Matthews to present a First Amendment argument in his defense at trial.

Some of the most important and socially useful stories journalists prepare involve news concerning illegal and dangerous activities and the government's efforts to control them. Is the government doing enough to stop drug trafficking? Are police officers overstepping their bounds during criminal investigations? Are federal agents protecting individuals from financial fraud? Public response to journalistic efforts undertaken to explore the crimes and the criminals, as well as to *2 examine law enforcement activities, demonstrate the importance of the media's role as a governmental watchdog. That role is not diminished when the journalist must, on rare occasions and as a last resort, engage in activity that may technically violate a criminal statute, particularly when the violation does not cause the harm that the law was intended to prevent. In such cases, journalists do not claim to be above the law; they argue simply that they must be allowed to present a First Amendment defense for consideration by the finder of fact.

Strict application of § 2252 to the gathering of news directly implicates First Amendment rights. Newsgathering clearly is protected by the First Amendment's free press guarantee, and even a statute that may not be unconstitutional on its face and attempts to prevent harms as grave as those that result from child pornography could become unconstitutional in application. Often, reporters have no source for reliable information regarding matters of public interest other than their willingness to see first-hand how this illegal activity occurs, and whether authorities are working effectively to control or eliminate it.

Therefore, *Amici* ask this Court to overturn the decision of the district court and remand the case to allow the presentation of a First Amendment defense at trial.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*3 ARGUMENT**

SECTION 2252, AS APPLIED TO A JOURNALIST ENGAGED IN NEWSGATHERING, IS ARGUABLY
OVERBROAD AND THEREFORE UNCONSTITUTIONAL, AND THE JOURNALIST MUST BE ALLOWED TO
RAISE THAT DEFENSE AT TRIAL.

## I. Newsgathering is constitutionally protected.

It is important to begin by noting that the First Amendment's guarantee of press
freedom is meaningless if journalists do not possess a concomitant right to gather
the news. In *Branzburg v. Hayes*, 408 U.S. 665, 707 (1972), the U.S. Supreme Court
recognized that the First Amendment's protection of a free press carries with it
protection for essential newsgathering.

There can be no doubt that newsgathering, as well as the dissemination of news,
deserves protection under the umbrella of the First Amendment. "News must not be
unnecessarily cut off at its source," Justice Stewart wrote in 1972, "for without
freedom to acquire information the right to publish would be impermissibly
compromised." *Branzburg* at 728 (Stewart, J., dissenting, joined by J. Brennan and
J. Marshall). See also *Zemel v. Rusk*, 381 U.S. 1 (1965) (recognizing that a right
to gather news must exist in some form).

Newsgathering is essential to preserving a free press and the free flow of
information, as "freedom of the press can be no broader than the freedom of
reporters to investigate and report the news." 28 C.F.R. 50.10 (1998) (Attorney **\*4**
General's "Policy with regard to the issuance of subpoenas to members of the news
media").

## II. First Amendment defenses to a prosecution under the law therefore must be allowed at trial.

Although the § 2252 prohibitions on trafficking in child pornography on the
Internet are intended to serve an important interest, the statute cannot be exempt
from the First Amendment. No statute exists outside the parameters of the
Constitution. *See Marcus v. Search Warrant*, 367 U.S. 717, 731 (1961) (holding that
no state is "free to adopt whatever procedures it pleases for dealing with
obscenity . . . without regard to the possible consequences for constitutionally
protected speech").

Moreover, because an otherwise valid law can conflict with the First Amendment, the
court must consider whether it is overbroad as applied in a given situation. As the
U.S. Supreme Court has stated:
The objectionable quality of vagueness and overbreadth does not depend upon absence
of fair notice to a criminally accused or upon unchanneled delegation of
legislative powers, but upon the danger of tolerating, in the area of First
Amendment freedoms, the existence of a penal statute susceptible of sweeping and
improper application.

*NAACP v. Button*, 371 U.S. 415, 432-33 (1963).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Application of § 2252 to a journalist engaged in the constitutionally protected act of newsgathering demands careful balancing of competing interests **5** because constitutional freedoms "are delicate and vulnerable, as well as supremely precious in our society." *See Branzburg, supra,* and *NAACP* at 433. "Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity" and must take care not to apply statutory provisions in a manner that violates constitutional rights. *Id.*

### III. Technical violations of criminal statutes do not negate the need to balance First Amendment interests.

At times, journalists may, as a last resort, find it necessary to employ newsgathering techniques that technically violate statutory provisions in order to obtain information of compelling public interest.[FN1] Strict application of these **6** statutory provisions to newsgathering, even if they are otherwise valid, can unconstitutionally burden the right of journalists to gather the news. *See Lee v. The Columbian*, 16 Med. L. Rptr. 1261, 1264 (Wash. Super. Ct. Clark County 1988) (accusation that a journalist violated telephone harassment law was rejected because journalist's calls were protected as "routine newsgathering" and liability based on newsgathering "would constitute an unwarranted interference in the newsgathering process in violation of the First Amendment to the United States Constitution").

> FN1. It is insufficient to counter, as the district court did below, that there are alternative means of obtaining similar information without violating the statute:
> Surely there are other ways of determining the amount of child pornography available on the Internet and whether the images are easy to obtain. While the Court is hesitant to give news gathering tips, the Court agrees with the Government that other, legal avenues of investigation are available. For example, a reporter could study the number of prosecutions brought by the government and examine the public records in those cases. A reporter could develop sources, including victims of child pornography and people already convicted of violations. Finally, a reporter could examine reports to public interest groups that track incidents of child pornography distribution. *United States v. Matthews*, 11 F.Supp.2d 656, 663 (D.Md. 1998). Finding that alternatives were available does not address whether a chosen alternative is protected by the First Amendment. Instead, the court found that direct research into a controversial topic is not protected by the First Amendment because there were biased secondary sources, self-interested government officials, and – most surprisingly - convicted felons to rely upon when gathering the news.

At least one court has held that when the interests protected by tort laws were not adversely affected by a journalist's newsgathering actions, which themselves might be construed as tortious, the journalist would not be liable for the violation. *Desnick v. American Broadcasting Cos., Inc.*, 44 F.3d 1345 (7th Cir. 1995). The same principle should apply when newsgathering implicates criminal laws, as one dissenting judge found in an Oklahoma case where nine journalists were charged with trespassing while covering a protest. The judge noted that the journalists posed no

threat to public order or to the private property rights that the criminal trespass
statute aimed to protect and concluded that prosecuting the journalists was
unconstitutional:
I would not permit our criminal trespass statute to be used illegitimately and in
this manner in order to prevent the public from *7 knowing what their government is
doing. . . . It is inconceivable to me that a contrary conclusion can be sanctioned
in our democratic society.

*Stahl v. Oklahoma*, 665 P.2d 839, 849 (Okla. Crim. App. 1983)(Brett, J.,
dissenting), *cert. denied*, 104 S.Ct. 973 (1984).

Judge Brett did not conclude that journalists could claim an absolute right to
cross any property lines they chose in pursuit of a news story. Rather, he
recognized that the public interest demands that the constitutionally protected act
of newsgathering - essential to a free press - be taken into account when statutory
prohibitions are applied to members of the news media. He recognized that a statute
criminalizing certain behavior "cannot be used arbitrarily and unreasonably to
exclude the press from their constitutionally protected news gathering role" when
the government "does not present a legitimate or important countervailing
interest." *Id.* He further recognized that in this case, the journalists had not
interfered with a landowner's right to the use and enjoyment of private property.

Under certain circumstances, the only available means to test law enforcement is to
directly challenge the barriers imposed by criminal statutes. The reporters in
*Stahl* trespassed because, otherwise, their reports on a public controversy would
have been limited to statements by the opposing parties to the *8 controversy.
Similarly, the following examples illustrate how journalists seeking information
about matters of public interest may have to resort to technical violations of a
law in order to gather that information first-hand:
* Recognizing that simply approaching election officials for information about
voting fraud would not tell the whole story, a journalist in Idaho successfully
registered and voted five times in the same school district trustee election -
casting blank ballots all but one time - and then wrote an article about it. As a
result of the journalist's allegedly unlawful activity, the infirmities of an
electoral process were exposed both to the public and to the government itself. But
the article also alerted authorities to the journalist's activities, and he was
charged with registering to vote illegally. His editor also was charged with
inducing him to break the law. Shortly before trial in October 1983, the judge
dismissed the complaints. *Idaho v. Hail,* No. 16075 (Dist. Ct. complaint dismissed
Oct. 12, 1984 Shoshone County); *see also Ballot Box Scheme Nets Charges Against
Reporters and Editors*, The News Media And The Law (The Reporters Committee for
Freedom of the Press, Washington, D.C.) January-February 1984 at 48.
* In 1977, the news director at WFMY-TV in Greensboro, N.C., noticed that a local
toy store openly displayed fireworks on a sales counter. After *9 verifying with
law enforcement officials that it was illegal to use or sell fireworks in North
Carolina, except at public fairs or carnivals, the news director sent a reporter
and a cameraman to the store to prepare a news report about the availability of the
illegal fireworks. The journalists purchased fireworks, then took the fireworks to
sheriff's deputies, who then arrested the toy store's owner for illegally
possessing and selling fireworks. The journalists filmed the arrest, and WFMY
featured it on its 6 p.m. news show.
The journalists subsequently were charged with illegally purchasing and possessing

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

fireworks. Their attorney asserted that they had not intended to violate the law, but rather had intended to expose possible violations of the law. *See Newsmen Arrested for Fireworks Sales Probe,* The News Media and the Law (The Reporters Committee for Freedom of the Press, Washington, D.C.) April 1978 at 44. A jury agreed in March 1978 and found the journalists not guilty. *State v. Smithwick,* No. 77 CR 15106 (N.C. Gen. Ct., Crim. Div. Davidson County Nov. 30, 1977); *State v. Garner,* No. 77 CR 15107 (N.C. Gen. Ct. Crim. Div. Davidson County Nov. 30, 1977).
* Shortly after the bombing of Pan Am Flight 103 in 1988, two journalists working for a French television network attempted to ship packages **\*10** containing fake bombs made of modeling clay, wires, and an alarm clock through three different airlines to test airport security. The packages were delivered to Pan Am, TWA, and Air France at Kennedy International Airport. *See Air Security 'Tests' Net Arrests,* The News Media and the Law (The Reporters Committee for Freedom of the Press, Washington, D.C.) Winter 1989 at 45.
A TWA employee notified the New York Port Authority Police of receiving a package containing something resembling a bomb, and Port Authority police seized that package, as well as another checked at the Pan Am counter. The package delivered to Air France was not found. *Id.*
The journalists were charged under 18 U.S.C. § 371 with conspiring to lie to airport personnel about the contents of the packages, but the journalists asserted through their lawyer that they never intended to violate the law. *United States v. Chaillou,* No. 89-11M-2 (E.D.N.Y. complaint filed Jan. 5, 1989, dismissed Aug. 16, 1994); *United States v. Frankel,* No. 89-11M-1 (E.D.N.Y. complaint filed Jan. 5, 1989, dismissed Aug. 16, 1994).
* Also shortly after the Pan Am Flight 103 bombing, an ABC reporter and cameraman who were researching a similar story on airport security were arrested for trespassing after they entered a restricted area on the tarmac at **\*11** Kennedy International Airport. The charges against the reporter and cameraman ultimately were dismissed. *New York v. Santana,* No. 9-Q-064698 (N.Y. Sup. Ct. complaint dismissed Feb. 1, 1989); *New York v. Wallace,* No. 9-Q-064699 (N.Y. Sup. Ct. complaint dismissed Feb. 1, 1989).

In all of these situations, journalists undertook activities that technically violated the law. They neither received "benefits" as a result of the violations, nor did their acts cause the harm the statutes meant to prevent. Instead, the stories revealed information of vital interest to the public that could have been obtained no other way. Without making that initial decision to step beyond statutory bounds in pursuit of stories of vital public interest, these journalists would have failed in their roles as government watchdogs for the public.

                                     CONCLUSION

No criminal statute can be exempt from the protections of the First Amendment. When applied to journalists engaged in newsgathering, strict application of a criminal statute often will fail to advance the interest government intends to protect. As Justice Sutherland wrote in *Grosjean v. American Press Co.,* 297 U.S. 233, 250 (1936):
The newspapers, magazines, and other journals of the country, it is safe to say, have shed and continue to shed, more light on the public and business affairs of the nation than any other instrumentality of publicity; and since informed public opinion is the most potent of all restraints upon **\*12** misgovernment, the suppression or abridgement of the publicity afforded by a free press cannot be

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

regarded otherwise than with grave concern.

Justice Sutherland recognized that "an informed and enlightened public opinion was the thing at stake" when statutes interfere with First Amendment freedoms. *Id.*

The free flow of information to the public is vital to democracy. The public has a strong interest in knowing both about the prevalence of child pornography on the Internet, and about law enforcement efforts to eradicate it. Arguably, the most effective way to report on these issues is to gain access to the Internet to observe these matters first-hand.

Matthews contends that he was doing just that - engaging in constitutionally protected newsgathering - when he was charged with violating § 2252(a). If his assertions are true, strict application of the statute here would violate the First Amendment. Matthews should be given the opportunity to present his newsgathering defense for consideration by the triers of fact in this case. Otherwise, strict application of the statute in these circumstances will not only fail to serve the government's goal of eliminating electronic trafficking in child pornography, it will violate the First Amendment's guarantee of a free press and an informed public. Therefore, *Amici* ask this Court to overturn the conviction and sentencing of Matthews and allow him to present a First Amendment defense to the charges leveled against him under § 2252(a).

Appendix not available.

UNITED STATES OF AMERICA, Appellee, v. Lawrence C. MATTHEWS, Appellant.
1999 WL 33612797 (C.A.4)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.